| 85　379|
| 96　309|

# Harmon *v.* Lehman, Durr & Co.

*Bill in Equity by Mortgagor, for Account and Redemption; Cross-Bill for Foreclosure.*

1. *Usury in mortgage; stipulation for payment of attorney's fee on foreclosure.*—A stipulation in a mortgage given for money loaned, providing for the payment of a reasonable attorney's fee on foreclosure, is lawful and valid, and does not render the contract usurious.

2. *Same; stipulation for delivery of cotton for storage and sale on commission, or payment of liquidated damages on non-delivery.*—In a mort-

[Harmon v. Lehman, Durr & Co.]

gage to secure the payment of money loaned, with interest, a stipulation binding the mortgagor to deliver, for storage and sale on commission, one bale of cotton for each ten dollars loaned, or to pay, as liquidated damages, one month's storage and customary charges for selling, on the number of bales not delivered, does n t render the contract usurious, *if* the mortgagee is engaged in business as a warehouseman or commission-merchant, *and* the mortgagor has a reasonable expectation that he will be able to deliver the stipulated number of bales; but, if the mortgagee is not engaged in such business, or if the mortgagor has no such reasonable expectation, the contract is usurious.

3. *Same.*—Though the mortgagor himself had no reasonable expectation that he would be able to deliver the stipulated number of bales, yet, if it appears that he borrowed the money for the accommodation and use of his sons, who were engaged in a mercantile business, and who represented to the mortgagee that they could control in their business several hundred bales more than the stipulated number, this satisfies the rule, and relieves the contract of any usurious taint; and the mortgagor can not be heard to claim, as against the mortgagee, that he was only a surety for his sons.

4. *Same.*—While a stipulation for the payment, on non-delivery, of the usual and customary commissions for selling, is lawful, it is not permissible to charge more on non-delivery than for cotton delivered and sold; as where 50 cents per bale is the usual charge for selling, and 65 to 75 cents per bale is the stipulated charge on non-delivery; nor can any custom be allowed to sanction this difference of charges for selling, where money is or is not advanced and secured by mortgage.

APPEAL from the Chancery Court of Montgomery.

Heard before the Hon. THOS. W. COLEMAN.

The bill in this case was filed on the 27th December, 1886, by John F. Harmon, against Lehman, Durr & Co., partners in trade as warehousemen and commission-merchants in the city of Montgomery; and sought to enjoin a sale of lands under a mortgage which the complainant and his wife had executed to the defendants, and for an account and redemption, charging usury. The defendants answered, denying the charge of usury, and asking a foreclosure of the mortgage, as under cross-bill regularly filed.

The mortgage was dated January 26th, 1886, conveyed a tract of land containing about 1,800 acres, with crops, horses, mules, &c., and was given to secure the payment of a note for $5,000, given for money loaned or advanced. The note was dated January 26th, 1886; was signed by said J. F. Harmon and wife, and by Harmon Brothers individually and as partners, who were their sons; and it contained a waiver of exemptions of personalty. The mortgage, which is too long for insertion in full, contains the following (with other) provisions: "*Whereas*, we are indebted to Lehman, Durr & Co., in the sum of $5,000, with interest from this date, as evidenced by our promissory note of this date, payable on 1st October, 1886; *and whereas* said advance

[Harmon v. Lehman, Durr & Co.]

was obtained on the faith of the statements and representa-
tions made by us, that we could deliver, or cause to be
delivered to the said Lehman, Durr & Co., at their ware-
house, by the 1st day of October next, *five thousand* bales of
cotton, for storage and sale upon commission, which said
statements and representations I hereby expressly warrant to
be true:   Now, in consideration of the premises, and the
agreement made by the said Lehman, Durr & Co., as herein-
after stated, [we] do hereby promise and agree to deliver,
or cause to be delivered to the said Lehman, Durr & Co., at
their warehouse in the city of Montgomery, by the 1st day
of October next, 500 bales of cotton, of the average weight
of 500 lbs. per bale, and the average quality of middling; to
be sold by them as such commission-merchants, and from
the proceeds thereof to pay themselves the amount of storage
which may be due on said cotton, and one and one-half per
cent. on the amount of such sales, for commissions for selling
said cotton; and then to apply the proceeds of so much of
said cotton as may be delivered by——to the payment of the
amount of indebtedness hereinabove specified, with interest
thereon.   And the said Lehman, Durr & Co. agree and
promise by their [acceptance?] of this writing, in considera-
tion of said promise and agreement to deliver said cotton, in
consideration of the statements and representations heretofore
and herein made by us, as to our ability to deliver and to
control the delivery of cotton for storage and sale on com-
mission, and in consideration of the warranty of the truth
thereof, to provide and furnish storage for the same, and for
all other cotton which we may send to them for storage and
sale, until the same is sold, and to sell the same for the com-
missions aforesaid; and in consideration thereof, in order to
compensate said Lehman, Durr & Co. for their trouble and
expense in providing and furnishing safe storage and neces-
sary and proper means and facilities for selling said cotton,
we promise and agree, in default of delivery or causing to
be delivered said 500 bales of cotton, or any part thereof, to
pay to the said Lehman, Durr & Co., on the 1st day of
October next, as liquidated damages, an amount equal to
fifty cents per bale for one month's storage, and to one and
one-half per cent. commissions on the value of the cotton in
said city of Montgomery, on the 1st day of October next, so
failed to be delivered.   Now, therefore, in order to secure
the payment of said sum of money due by said promissory
note, with interest thereon, and the delivery of said cotton

[Harmon v. Lehman, Durr & Co.]

for storage and sale, or the payment of said stipulated damages as herein specified, and to secure any future advances which may be made to us by said Lehman, Durr & Co, not to exceed——dollars, and to be due and payable on the 1st day of October next, we, the said J. F. Harmon and Nancy Harmon, do hereby grant," &c. It was also stipulated in the mortgage, "that the legal title to said crops shall vest in the said Lehman, Durr & Co. so soon as the same shall be planted, or come into existence, and they shall have the exclusive control of the same thereafter;" that "no cotton delivered by third persons to Lehman, Durr & Co., for storage and sale on commission, shall be treated and considered as delivered on our account, and as any part of the performance of the agreement herein above set out, unless we shall, at or prior to the time of the delivery of the same, notify said Lehman, Durr & Co., in writing, that the same is so delivered, and is to be sold (and storage and commissions thereon collected) under this contract, with the indorsement thereon of the person or persons owning the same, that he or they consent thereto;" that Lehman, Durr & Co. might at once take possession of the property conveyed, on default of payment or performance by the mortgagors, and sell at public or private sale; and that "the attorneys' fees, and other expenses which may be incurred by the said Lehman, Durr & Co. in the collection of said several sums for the payment of which this conveyance is a lien, by a foreclosure of this mortgage or otherwise," should be assumed by the mortgagors, and paid out of the proceeds of sale of the property.

On final hearing, on pleadings and proof, the following opinion was delivered by Chancellor THOS. W. COLEMAN:

"The case made by the bill is, that Harmon Brothers borrowed money from Lehman, Durr & Co., to be used in the purchase of cotton, and gave their father, John F. Harmon, as surety, who signed the note, and executed a mortgage upon certain lands belonging to him, which are described in the bill; with the understanding that the money was to be used in the purchase of cotton, which, when sold, was to be applied to the payment of the mortgage debt. The bill further alleges that the loan was usurious. The bill alleges the purchase of cotton with the money, and asserts that, if the proceeds had been applied according to the agreement, the mortgage debt would be paid; and it concludes with an offer to pay any balance that might remain unpaid.

[Harmon v. Lehman, Durr & Co.]

"Respondents admit that Harmon Brothers desired to borrow money, and their refusal to loan without security; also, the execution of the note and mortgage, and the loan of $5,000; but they deny that this loan was to Harmon Brothers, and deny that it was a part of their agreement that the money was to be used in the purchase of cotton alone, or that the proceeds of the cotton purchased with the money was to be applied to the payment of the debt secured by the mortgage. This short statement presents the main points for consideration.

"Taking detached portions of the complainant's testimony, it may be that his proof sustains the case made by the bill; but, considering his evidence as a whole, it is far from satisfying the court that he is entitled to all the relief asked for in his bill. In complainant's deposition, T. B. Harmon uses the following language: 'We stated to him [meaning John F. Harmon, their father] that we wanted to make arrangements for him to borrow some money, and for him to be responsible, or bind his lands for that amount, and let us have some money to buy some cotton; and that when we sold the cotton, we would take up the mortgage. Our father said, that was all right.' Is there any reason why other portions of complainant's testimony should have more weight than this simple statement, which is so consistent with the entire transaction and proceedings from that time on, and with John F. Harmon's own conduct? He evidently understood that the money was borrowed in his name, or else why give the check to Harmon Brothers? If he understood that he was simply a surety, and Harmon Brothers the principals, by what process of reasoning could he come to the conclusion, that the money was placed to his credit, a mere surety, by Lehman, Durr & Co., instead of the credit of the principals? It may be said that equity looks at the real transaction of the parties, as it was, and not as it appears to be. That may be true; but equity can not prescribe the terms and securities upon which a man may lend his money, provided those terms do not contravene some statute, or public policy; nor will a court of equity change these terms. As between John F. Harmon and his sons, he doubtless borrowed the money for them; he was willing to trust them. But, as between the complainant, Harmon Brothers, and Lehman, Durr & Co., the latter evidently had the right to prescribe the terms of the loan. The note and mortgage bear date January 26th, 1887. T. B. Harmon testifies, that

it was not signed until several days after this date, but was signed before the money was drawn out by them. Why do we find them on the 3d February using this money for other purposes than to buy cotton, if it was to be used only in the purchase of cotton? Considering the whole evidence of the complainant together, it fails to impress the court favorably.

"It must not be understood that the conversations between John F. Harmon and Harmon Brothers, in the absence of Lehman, Durr & Co., or some member or agent of the firm, are considered by the court as legal evidence, or as binding upon them, unless communicated, and so as to have entered into the making of the contract for the loan. Without passing upon the question, whether Harmon Brothers were the agents of Lehman, Durr & Co. in making the trade with complainant, as insisted by him, we simply state, that one who deals with an agent does so at his peril; and the proof does not sustain the claim that Harmon Brothers were authorized by respondents to make that contract. When the complainant's evidence is considered in connection with the respondents' testimony, we can not perceive any reason why complainant should have the proceeds of the cotton bought and paid for with the borrowed money, applied to the mortgage debt. The statement of Harmon Brothers, that the respondents were directed to sell the 77 bales of cotton and so apply the proceeds, is not sustained by the evidence; and the application made by them, as shown in the stated account rendered, to which there was no dissent, must be conclusive against Harmon Brothers. We think the complainant utterly fails to sustain this branch of his case. If there was any money in the hands of respondents, belonging to Harmon Brothers, or if the evidence established the fact that Lehman, Durr & Co. were properly chargeable with cotton, or the proceeds of cotton, for which they have not accounted, after the payment of any balance which might be due them from Harmon Brothers, such money should be credited on the debt secured by the mortgage of Jan. 26th, 1886.

"Let us now consider the question of usury. If, upon consideration of all the circumstances, it should appear that the language used, or the stipulations made, 'was a mere device to evade the statute against usury, to conceal the real intent, the mere form will not relieve the contract from the consequences of usury.'—*Swilley & Riley v. Lyon & Baker*, 18 Ala. 552, per DARGAN, C. J. 'The intent is the test. Was it intended to compensate for risk, trouble or expense,

[Harmon v. Lehman, Durr & Co.]

incurred at the risk of the debtor; or was it intended to give the creditor additional profit for the loan of money?' Was it reasonably expected that 500 bales of cotton could be delivered by the Harmons? If not, Lehman, Durr & Co. could as easily have contracted for the payment of so much money as interest, as for the storage and commission.—*Uhlfelder v. Carter's Adm'r*, 64 Ala. 532. Did the respondents make the heavy outlay of $25,000, or $30,000, annually, in running their business as warehousemen, and in order to meet this expense, and to promote their interest as commission-merchants, loan money, and require shipment of so much as ten bales on the $100 loaned? The witness Roman states, and repeats, that the expense is estimated and provided for after the money is loaned. He says: 'We regulate the Fall business by the advances made in the Spring. We engage such force as we think necessary from the amount of money advanced in the Spring. The arrangements are made by May 1st, for we can tell by that time how much cotton we can handle.' We do not think that a contract made in the Spring, which is at the time usurious, can be purged of usury, because respondents incur large expense to enable them to carry out their part of the usurious contract? They contract to loan a man $100, for which he is to pay them eight per-cent. interest, and, in addition thereto, make him agree to ship them ten bales of cotton, worth $400, or, in default thereof, pay as liquidated damages an amount equal to fifty cents per bale storage, and one and a half per-cent. commissions, amounting to eleven per-cent. additional to the legal rate; total interest, nineteen per-cent. A shipment of three bales would pay the interest on the $100; yet the borrower is required to ship seven more bales, storage on the extra seven bales ($3.50), commissions ($4.20); total extra payments, $7.70, or nearly double legal interest. This is usury, unless it be held that the expense incurred to serve the business of warehousemen and commission-merchants frees the contract from usury. Can this be done, when the facts are as stated by Mr. Roman? 'We regulate the expenses after the money is loaned.'

"But, under the facts of this case, could Lehman, Durr & Co. have reasonably expected the shipment of 500 bales of cotton from the Harmons, including the cotton to be made by John F. Harmon? They did business with John F. Harmon & Son in 1884, and with all of them in 1885. They had very accurate information as to the means of these per-

sons.  In January, 1886, Harmon Brothers were not able to
meet their past liabilities, and Lehman, Durr & Co. refused
to lend them money, or to do business longer without secu-
rity.  Respondents were reasonably advised that from thirty
to fifty bales was the extent of John F. Harmon's ability to
ship.  From what source was the 500 bales to come, which,
at $40 per bale, required an outlay of $20,000?  Respond-
ents say, that Harmon Brothers were to buy out some mer-
chant or business at Union Springs.  But, how were they to
buy out this large business?  They were not then able to
pay their indebtedness to Lehman, Durr & Co.  Their father
was to mortgage his property, to obtain a loan of $5,000.
As prudent men, Lehman, Durr & Co. reasonably knew that
the cotton (500 bales) would not be shipped, unless they
furnished the money to buy it with.  No one else would loan
them the money, for they were under mortgage and in debt
to Lehman, Durr & Co.

"The commissions to be paid are in excess of the usual
rate of commissions charged in Montgomery.  Whatever
view we take of the transaction, we are of opinion that the
contract was usurious, which required payment of commis-
sions and storage on cotton not shipped.

"The greatest difficulty is in determining the *status* of the
seventeen bales sent to respondents by John F. Harmon, on
his wagons.  This cotton was included in the mortgage, and
the law would apply its proceeds to the credit of the mort-
gage debt, unless John F. Harmon has by some act waived
his right to have it so applied.  Mr. Durr was questioned
in regard to this cotton.  *Qu.*  'The negro told you, did not
he, that he came from John F. Harmon's plantation?'  *Ans.*
'Oh, yes; he carried the cotton to the warehouse.'  *Qu.*
Didn't he say he came from J. F. Harmon's plantation?'
*Ans.*  'Well, he brought the cotton from Mr. Harmon's, is
about the way they stated it.'  Mr. Goetter says, that all the
cotton was shipped in the name of Harmon Brothers, and
for these seventeen bales refers to 'Exhibit D;' but this ex-
hibit evidently refers to other cotton.  The letter of October
8th states, that the seventeen bales of October 6th were ship-
ped by railroad, for which Harmon Brothers held bill of
lading.  The other cottons mentioned in said exhibit (D) do
not satisfy us that they were the cottons hauled in J. F.
Harmon's wagons.  The respondents' testimony is not satis-
factory as to these seventeen bales hauled from J. F. Har-
mon's plantation, and we presume tnat they had reasonable

[Harmon v. Lehman, Durr & Co.]

knowledge that it came from his plantation. Has J. F. Harmon lost the right to have this cotton applied to the mortgage debt? Respondents say, that it was received in the name of Harmon Brothers. Complainant says in his deposition, that he sent Lehman, Durr & Co. twenty-four bales of cotton; 'sent a part by wagons, and my son sent a part by railway from Union Springs. I sent seventeen bales by wagon, for which they sent me back bills, or receipts, marked as Exhibits O, P, Q, R.' These exhibits are dated Sept. 30, Octo. 13, Nov. 5, and Nov. 10, extending over a term of five or six weeks. All of them are for cotton on account of Harmon Brothers, and none of them on account of J. F. Harmon. Mr. J. F. Harmon testifies, that some of his cotton had been shipped by his son from Union Springs. Why does he hold these receipts so long, and make no objection? and why permit his son to ship a part of the cotton? He may have been mistaken as to the financial condition of his sons. He may have had the utmost confidence in their financial ability and integrity, and supposed they would see that the mortgage debt was paid; we can not tell. But, having consented that Harmon Brothers might use this cotton for their own benefit, we are of opinion that Lehman, Durr & Co. should not suffer by reason of the fact that the cotton was included in the mortgage.

"If, however, Lehman, Durr & Co. have extended no further credit, or have not advanced any money, upon this cotton shipped or received in the name of Harmon Brothers, then we see no reason why the cotton raised on the plantation of J. F. Harmon should not be applied to the mortgage debt. J. F. Harmon identified the time of sending the seventeen bales by the exhibits, O, P, Q, R. Exhibit R is a receipt for five bales, and is dated Sept. 30, 1886; Exhibit P is for two bales, and dated Octo. 12; Exhibit Q is for five bales, and dated Nov. 5; and Exhibit O is for five bales, and dated Nov. 10. By reference to the stated account of Lehman, Durr & Co., it will be seen that the last debit of Harmon Brothers was for the payment of their check for $700, in favor of the Bullock County Bank, and dated October 9th, 1886. Harmon Brothers drew no money, and received no credit from Lehman, Durr & Co., because of the two bales sent to them October 12th, five bales Nov. 5th, and five bales Nov. 10th, identified by Patterson, Garland, and Covington. As to these twelve bales sent by wagons, Lehman, Durr & Co. have been no more damaged or injured by the receipt

of this cotton, though sent in the name of Harmon Brothers, than if the same had been sent in expressly in the name of John F. Harmon, with directions to be applied to the mortgage debt. This being true, is there any equitable reason why the proceeds of the twelve bales should not be so applied. As for the seven bales shipped by his son from Union Springs, we have no dates given us, and can not say, but judge from the account, this shipment preceded the cotton sent by wagons.

"The mortgage provides for the payment of reasonable attorneys' fees incurred in the collection by foreclosure of the mortgage or otherwise, and we regard this as a proper charge.

"There is a written agreement attached to the answer, and signed by complainant's solicitors, providing that respondents may be granted such relief as the facts of the case show they are entitled to, to the same extent as if set up in a cross-bill, and relief specially prayed. This would be allowable without such agreement.—55 Ala. 345."

The chancellor therefore rendered a decree, declaring that the defendants were entitled to a foreclosure of the mortgage, for the amount of the note with interest, and to a reasonable attorneys' fee for services rendered in the cause; disallowing their claim for storage and commissions on cotton not delivered, and charging them with the value of the twelve bales of cotton particularly mentioned in his opinion; and ordering a statement of the accounts by the register, and a sale of the land by him, if the amount found due on the accounting was not paid within forty days.

From this decree the complainant appeals, and here assigns as error—1st, "that the chancellor did not allow him all he claimed in his bill;" 2d, "that the chancellor did not allow him credit for all the cotton raised on his plantation, and delivered to Lehman, Durr & Co.;" 3d, "that the court allowed the respondents attorneys' fees for foreclosing the mortgage." Cross-assignments of error are also made by Lehman, Durr & Co., because the chancellor held the contract usurious, and refused to allow them storage and commissions on the cotton not delivered, as liquidated damages.

ARRINGTON & GRAHAM, and WATTS & SON, for the complainant, cited *Matlock v. Mallory*, 19 Ala. 694; *Miller v. Bates*, 35 Ala. 580; *Webster v. Singley*, 53 Ala. 208; *At-*

*wood v. Wright,* 29 Ala. 346; *Rogers v. Torbut,* 58 Ala. 523; *Van Pelt v. McGuire,* 55 Ala. 344; *White v. Life Insurance Co.,* 64 Ala. 419.

TROY, TOMPKINS & LONDON, and BRICKELL, SEMPLE & GUNTER, for Lehman, Durr & Co., cited 1 Wait's Ac. & Defenses, 286; *Collier v. Barr,* 64 Ala. 543; *Uhlfelder v. Carter,* 64 Ala. 527; *Woolsey v. Jones,* 84 Ala. 88; *Dozier v. Mitchell,* 65 Ala. 511; *Rowland v. Rowland,* 40 N. J. Eq. 281; *Poppleton v. Nelson,* 12 Oregon, 349; *L. I. Bank v. Boynton,* 105 N. Y. 656; *Cockle v. Flack,* 93 U. S. 344; *Brown v. Harrison & Robinson,* 17 Ala. 774; *Pollard v. Baylor,* 6 Munf. 483; *Munter & Faber v. Linn,* 61 Ala. 492.

SOMERVILLE, J.—We have studied the record and the able opinion of the chancellor in this case with great care and interest, and the result is that we approve and adopt the chancellor's views in every respect save those hereafter noticed.    We direct that his opinion *in extenso* be published in the report of our decision.

Both the testimony and the arguments of counsel tend to show that the inquiry, whether John F. Harmon, or Harmon Bros. were principals in the debt to Lehman, Durr & Co., was deemed important in the preparation of this cause.    We confess we are not able to perceive its importance.    But, if we concede its materiality, we are not able to discover its bearing on the case before us.    It is manifest that the money raised was intended for, and used by Harmon Brothers, sons of John F. Harmon.    It is equally manifest that Lehman, Durr & Co. refused to advance to Harmon Brothers, on terms less binding than those demanded and acceded to.    The terms were, that John F. Harmon should give his note conjointly with Harmon Brothers, they signing as a firm and as individuals, and that the former, J. F. Harmon, should execute the mortgage to secure a compliance with the terms of the note.    The terms were acceded to, and the money obtained in the name of John F. Harmon, and immediately checked out by him in favor of Harmon Brothers.    The plain import of all this is, that, the requirements of Lehman, Durr & Co. being acceded to, the money was advanced to John F. Harmon as principal debtor, on the condition, and only on the condition, that all the other sureties and securities should be bound for its repayment.    Lending one's name by acceptance or other-

wise, with a consequent pledge of primary liability, without consideration or inducement other than a spirit of accommodation, is not infrequent in commercial transactions. In this case, all the parties were bound as principals for the payment of the money to Lehman, Durr & Co. As between themselves, Harmon Brothers may have been bound to indemnify John F. Harmon for any loss he suffered. And while as a crop lien, under the statute once of force, it is possible the facts we have been considering might exert some influence (on this question we intimate no opinion), considered as a mortgage, no question can arise growing out of the relations the parties sustain to each other, under the facts disclosed in this record.

Lehman, Durr & Co. were warehousemen and commission-merchants, for the storage and sale of cotton on commission. As such, they controlled a considerable amount of money, which it was their custom to advance to merchants and planters, as a means of increasing their business. Such, it was shown, was the general habit and custom of warehousemen and commission-merchants throughout the country. Their plan was as follows: At the opening of the agricultural season, they advanced to their customers a given sum of money, taking their notes for repayment, with interest from date, the payment to be made on some specified day during the next coming cotton season. The contracts contained the following additional stipulations: That for every ten dollars so advanced, the merchant or planter, as the case might be, bound himself to deliver to them, for storage and sale on commission, one bale of cotton; and to the extent he might fail to deliver the number of bales stipulated, he bound himself to pay to them, as liquidated damages, storage for one month, and commissions for selling, the same as if the cotton had been received, stored one month, and sold by them. These additional stipulations, it is contended, are in their nature usurious; and it is further specially contended that it was and is usurious under the facts of this case. The chancellor disallowed these charges, holding that they were usurious.

In this State, following the rulings of other courts, we have held that such contracts are not necessarily and *per se* usurious. If the person by whom the money is advanced is not engaged in the warehouse or commission business, and thus has no occupation which can be promoted by a compliance with its terms, such stipulation is but a cover for

unlawful interest.—*Uhlfelder v. Carter*, 64 Ala. 527. So, if the advance be made by a warehouseman or commission-merchant, and there is no reasonable expectation, or ground for believing, that the customer can perform the stipulation, this furnishes the requisite evidence that compliance was not expected, and renders the contract usurious. On the other hand, if on entering into, or obtaining such promise, there is a reasonable expectation, or ground for believing, that such contract can be complied with, this relieves it of all stain and imputation of usury; and the stipulation, if made to a warehouseman or commission-merchant, is binding.—*Dozier v. Mitchell*, 65 Ala. 511; *Woolsey v. Jones*, 84 Ala. 88; *Pollard v. Baylor*, 6 Munf. 433; *Cockle v. Flack*, 93 U. S. 344; *Matthews v. Coe*, 70 N. Y. 239.

The testimony in this case is very clear, that there was no ground for believing that John F. Harmon, the mortgagor, would be able to deliver the five hundred bales of cotton the contract bound him to deliver. He could have had no reasonable expectation of being able to deliver more than one tenth of that quantity. But Harmon Brothers, his sons, and for whose accommodation and use the money was obtained, were shown to be merchants engaged in business; and the testimony shows that they, in negotiating the advance, represented that they, in their business, would handle eight hundred bales of cotton, and whatever quantity their father failed to deliver, they would deliver, so as to complete the five hundred bales. This was sufficient ground for the reasonable expectation that the cotton would be delivered, and relieves the transaction of all imputation of usury on this account.

The stipulation in the mortgage to provide suitable storage &c. is not an independent consideration, to uphold a promise otherwise illegal, or without consideration. Such service is incident to all lines of business or employment, and on its face indicates nothing which the relation itself does not impose as a duty.—*Pheiffer v. Adler*, 37 N. Y. 164; 1 Wait's Act. & Def. 95.

There is one phase of this contract, however, which, in our judgment, stamps the transaction as usurious. The evidence shows that the usual charge, in the city of Montgomery, for selling consigned cotton was fifty cents per bale, *where no money was advanced* by the consignee. The price stipulated for in the present contract is a commission of one and a half per cent. on the proceeds of sale, which will ag-

gregate from 67 to 75 cents per bale—or from 17 to 25 cents more than this usual charge, estimating the price of cotton at from nine to ten cents per pound, as it was shown to be by the testimony. It is sought to legalize this charge, which is from thirty-four to fifty per cent. more than the price of fifty cents, by showing that it was the customary price charged by commission-merchants for selling cotton *where they advanced money.* The service to be performed in each contingency is precisely the same—the sale of the cotton. It is no more trouble to sell when money has been loaned, than when no money has been loaned. The thing to be charged for is the service rendered in making sale of the article consigned. The additional charge, therefore, from thirty-odd to fifty per cent. for the service rendered, can not rest on the consideration of the service. There is nothing to support it but the loan of the money, for which lawful interest is also charged.

Usury is the "taking more for the use of money than the law allows."—*Woolsey v. Jones*, 84 Ala. 88, 91. If the contract is usurious, no custom can legalize it, because no custom is good which is contrary to law. The lender, as we have often held, is not prohibited from charging an extra and reasonable amount for some incidental service, expense or risk, additional to the lawful interest, other than for the loan of money. He may charge the usual storage, and reasonable commission for selling consigned goods.—*Dozier v. Mitchell*, 65 Ala. 511; *Cockle v. Flack*, 93 U. S. 344. He may charge reasonable commission, if engaged in the business of a commission-merchant, for accepting bills of a customer, and providing funds for meeting such bills. This is a compensation for the service rendered in lending his credit, and raising money to meet the debt of another, as in *Brown v. Harrison*, 17 Ala. 774, and cases of that class; *Trotter v. Curtis*, 19 John. 160; s. c., 10 Amer. 211. It is not the case of charging an additional *bonus*, over and above lawful interest, for the mere use of the money.

We conceive the law to be, that where the borrower of money agrees absolutely to pay commission for advancing money on goods consigned, in addition to lawful interest for the money, and based on no incidental service to be rendered by the consignee, the so-called commission is none the less for the use of the money because called by another name than interest. To be sustained as lawful, and rescue the contract from the taint of usury, we repeat, this additional

[Harmon v. Lehman, Durr & Co.]

charge must be shown to be based on some service rendered, some trouble encountered, or inconvenience sustained, or. risk assumed by the lender, other than the advance of money. *Stark v. Perry*, (6 Lea, 411); s. c., 40 Amer. Rep. 47; *Davis v. Garr*, 55 Amer. Dec. 395, NOTE, and cases cited; *Fanning v. Dunham*, (5 John. Ch. 122); s. c., 9 Amer. Dec. 283. The charge, moreover, must be fair and reasonable; and the courts will scrutinize it with care, if not suspicion, with the view of probing its true character. If it purports to be a charge for some incidental service, to be rendered by the lender to the borrower, it must be a reasonable charge adequate to the service, not extravagant or excessive, at the risk of being pronounced a mere cover for usury.

The appellees, Lehman, Durr & Co., were entitled to charge lawful interest for their money loaned. They could stipulate for the *bona fide* consignment of cotton by the borrower, and he could lawfully agree to pay reasonable storage on such cotton, in view of the fact that the consignees were warehousemen engaged in the cotton business. They could also charge the usual and reasonable price for selling cotton, such as was customary among commission-merchants in Montgomery. But they could not charge one price for this service where no money was loaned, and a larger price for the same service where money was loaned. The necessary inference is, that the excess of charge was not for the service, but as a *bonus* for the use of the money, additional to lawful interest.

From the principles declared above, it necessarily follows that the Harmons, or J. F. Harmon, can take nothing by their assignments of error, and the same are disallowed.

In the case of *Lehman, Durr & Co. v. Harmon*, the chancellor erred in disallowing storage and customary commissions of fifty cents per bale, for the cotton promised to be delivered under the contract. To this extent, the decree of reference is altered and amended, and the register will take and state an account between the parties, and report the same to the chancellor with all convenient speed. All other questions are reserved for decision by the chancellor.

Reversed and rendered.